IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 24, 2012 Session

IN RE JOSEPH L.

**Appeal from the Juvenile Court for Davidson County**
**No. 2009107      Betty K. Adams Green, Judge**

**No. M2011-02058-COA-R3-PT - June 25, 2012**

Mother challenges the trial court's termination of her parental rights. She asserts that the Department of Children's Services failed to make reasonable efforts to find a suitable relative placement. We find no merit in Mother's arguments and affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Lydle Willis Jones, Nashville, Tennessee, for the appellant, Samantha L.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Douglas Earl Dimond and Joshua Davis Baker, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Samantha L. ("Mother") gave birth to Joseph L. on November 2, 2006. In early January 2009, the Department of Children's Services ("DCS") filed a petition in juvenile court for emergency removal. According to the petition, DCS received a referral that Joseph (age 2) and a sibling (age 6) were suffering environmental neglect and had been seen wandering in the street. The two children were living with their maternal grandmother, Sherry J.; Mother had gone to jail a few weeks earlier, and the children's father was in prison. DCS found deplorable conditions in the home, including a roof that had caved in;

animal feces on floors, clothing, and bedding; a dead animal in the yard; and a strong rotten odor in the home. The children were not dressed appropriately and were hungry and dirty. The maternal grandmother was in an infirm physical state and unable to care for the children. DCS also interviewed Mother in jail.

DCS determined that there was no less drastic alternative to the removal of Joseph to state custody. On January 7, 2009, the juvenile court entered an emergency protective order placing Joseph in temporary state custody and appointing a guardian ad litem for him; DCS petitioned to have Joseph declared dependent and neglected. After a preliminary hearing on January 26, 2009, the court determined that Joseph should be placed in the custody of Cedric C. (Joseph's stepfather) and Yvonne C. (Cedric's mother).

In June 2009, the guardian ad litem filed a petition for dependency and neglect and emergency removal. Cedric C. had moved out of the home where his children and Joseph lived, leaving Yvonne C. to care for four children on her own. Yvonne C. informed DCS that she was no longer able to care for Joseph. The juvenile court issued an emergency protective order placing Joseph in DCS custody.

On June 24, 2009, Mother pled guilty to aggravated assault and was sentenced to six years in prison.

After a hearing on July 7, 2009, the juvenile court adjudicated Joseph dependent and neglected based upon a finding of severe environmental neglect. The court found that DCS had "made reasonable efforts to place the child with a relative and/or friend without success," and Joseph was to remain in DCS custody. Mother was to have visitation with Joseph once a month during her incarceration.

DCS entered into a permanency plan with Mother on October 7, 2009,[1] with alternative goals of (1) return to parent or (2) exit DCS custody to live with a relative. At that time, DCS had placed Joseph with Clechette W., a foster parent. With respect to the primary goal of returning Joseph to Mother, the permanency plan required Mother to perform numerous actions, including: demonstrating anger management skills, participating in home maker training after her release from incarceration, continuing and completing a 12-step program, protecting Joseph from maltreatment, resolving all of her legal issues, seeking legal employment and/or financial assistance, finding safe and stable housing, using public transportation until able to get a car, completing a parenting assessment while incarcerated

---

[1] According to the testimony of a DCS case manager, DCS also entered into a permanency plan with Mother on July 27, 2009. This plan does not, however, appear in the record on appeal, which includes only the permanency plans dated October 7, 2009, and April 21, 2010.

and following the recommendations, refraining from illegal activity after release from incarceration, and continuing to work on job training and job search. As to the goal of relative placement, the permanency plan required Mother to provide DCS with the names of family members who might be able to care for Joseph. Mother signed the permanency plan, and it was approved by the court.

DCS developed another permanency plan in April 2010 with alternative goals of return to parent or adoption. Joseph remained in the custody of Clechette W. at that time. Mother objected to the goal of adoption. At a permanency hearing in May 2010, the court approved the permanency plan.

DCS filed a petition for termination of parental rights against Mother on June 18, 2010.[2] With respect to Mother, the petition alleged the following grounds for termination of her parental rights: abandonment by an incarcerated parent pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), substantial non-compliance with permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2), and persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Sherry J., Joseph's maternal grandmother, filed a petition for temporary custody on July 20, 2010. She alleged that she had been very ill at the time when Joseph was removed from her home and that she had subsequently been hospitalized in a critical care unit. Sherry J. further alleged that she had now recovered from her illness and was able and willing to take custody of Joseph.

*Hearing*

The court held a hearing on the petition for termination and on Sherry J.'s petition for custody on October 25, 2010, and April 29, 2011.

Vickie Green, the DCS case manager for Joseph since August 28, 2010, was the first witness. She testified that Mother had not provided support for Joseph since he had been in custody. Ms. Green testified about the requirements of the permanency plans entered into with Mother. Although Mother had completed some of the tasks in the permanency plans, including obtaining her GED and taking domestic violence classes, she had not been able to accomplish many of the requirements due to her incarceration. According to Ms. Green, Mother was scheduled to remain in jail for "at least two more years."

---

[2]Although the petition also listed as defendants Joseph's legal father and an alleged father, this appeal involves only Mother.

Ms. Green testified about her observations of Joseph's interactions with Mother and with Sherry J. during the child's monthly visits with Mother at the jail. She stated that Joseph would hug Mother and then run around and go "under the chairs, over the chairs, shutting doors." When Joseph saw Sherry J. in court, Ms. Green thought that he did not seem to know his grandmother. Ms. Green "did not observe a bond between the birth mother and Joseph and the grandmother and Joseph." She also testified about Joseph's relationship with Clechette W., his foster mother.

When Ms. Green became case manager for Joseph, the termination petition had already been filed, so she was not involved in looking for possible relative placements. She had not been to visit Sherry J. in her home to evaluate the living conditions. Ms. Green admitted that the monthly visitations with siblings had not occurred since she had been the case manager because a previous case worker had failed to document these on the transfer summary. According to Ms. Green, Sherry J. had called her twice inquiring about Joseph or requesting visitation.

Clechette W., the foster mother, testified about Joseph's behavior and well-being in her home. Mother was the next witness. She testified that she had been incarcerated since Joseph came into DCS custody. Prior to her incarceration, Mother and Joseph (and some siblings) lived with Mother's mother, Sherry J. Mother acknowledged that Sherry J. was ill at the time when Mother was taken to jail but had since recovered and had moved to another place. Mother wanted Sherry J. to have custody of Joseph. She stated that she had suggested Sherry J., as well as Patricia L. (paternal grandmother), as a possible placement to DCS.

As to her incarceration, Mother testified that she was sentenced to six years and had served 22 months at the time of the October 2010 hearing. It was her understanding that she would be eligible for release in October 2011; she had previously been denied parole. Mother stated that, at present, she had no ability to provide financial support for Joseph. Mother testified that she had completed a number of classes while incarcerated, including classes on parenting, anger management, vocational office education, job readiness, and a twelve-step program. She had obtained her GED and tutored those working on their GED; she was a facilitator for a job readiness class.

Mother testified about Sherry J.'s relationship with Joseph. She stated that there was a strong bond between the two of them and that she supported Sherry J.'s petition for custody. She was satisfied that Sherry J. had corrected the environmental concerns that were present when Joseph was taken into DCS custody.

Mother acknowledged that she was incarcerated because she pled guilty to aggravated assault, a charge that arose when Mother used a box cutter to cut a woman across the

abdomen and on her chest, legs, and arm. Mother testified that she had an argument with the woman over Mother's children on September 27, 2008.

According to Mother, the conditions described by DCS when they took Joseph from Sherry J.'s home developed during the approximately two weeks after Mother was taken to jail. Because of Sherry J.'s declining health, Sherry J. and Mother had contacted Yvonne C. after Mother's incarceration to come get her three grandchildren. This still left Joseph and a sibling in the home with Sherry J. Mother was unable to find anyone to take these two children out of Sherry J.'s home.

Patricia L., Joseph's paternal grandmother, testified that, if the court awarded custody to Sherry J., she would be available as backup support. She testified in support of Sherry J.'s petition for custody and stated that Sherry J.'s current home was appropriate for young children.

Sherry J. was the final witness at the October 2010 hearing. She testified that she was hospitalized the same day that Joseph was removed from her home and did not remember much from that period of time. After about six months, she felt she had fully recovered. She did not remember the condition of the home at the time when she was hospitalized and the children were removed. Sherry J. asked the court to award custody of Joseph to her and stated that she was able to care for him and understood that he had special needs. She felt that she had a strong bond with Joseph. When she last saw him, he ran over to her with his arms out.

Sherry J. testified that, in August or September 2009, her health was back to about normal. She stated that she called DCS several times but admitted that she had not filed a petition for custody until July 2010.

The court heard additional testimony at the hearing in April 2011. Nicole Dillard, the case manager for Joseph from June 2009,[3] testified that during her incarceration, Mother had not been able to substantially comply with the parenting plan requirements that she provide a home or support. Ms. Dillard stated that Joseph had been placed in a foster home in June 2009 (with Clechette W.) but had to be moved at the end of 2010 to a temporary foster home. In January 2011, Joseph was placed with Mr. [Jackie] M.. According to Ms. Dillard, Joseph was thriving in the Jackie M. home; Jackie M. was addressing Joseph's behavioral problems and problems at school. Ms. Dillard opined that it was in Joseph's best interest to remain in the home with Jackie M..

---

[3]Ms. Green took over for a period of time when Ms. Dillard was on leave.

As to Sherry J.'s petition for custody, Ms. Dillard testified, "I don't think Ms. [J.] is a good choice for Joe." She had observed that Joseph did not want Sherry J. to touch him, and she did not think there was a bond there. As to Joseph's relationship with Mother, Ms. Dillard stated that Joseph exhibited defiant behavior after visits with Mother, and that during the visits, the child did not show any respect for Mother. He would spit on her, kick her, and tell her to shut up and leave him alone.

As to DCS's consideration of Sherry J. as a relative placement, Ms. Dillard stated that the department explained to Mother that they were not considering Sherry J. due to the conditions that necessitated removal of the child from her home. Ms. Dillard admitted knowing that Sherry J. had since recovered and that she had moved to another residence. No one from DCS visited the new home, however, because of the conditions in the home from which the child was removed. Ms. Dillard testified that someone from DCS had been to Sherry J.'s home prior to the removal of the children and given her information about getting the roof fixed and addressing the filth in the home and the lack of cleanliness of the children, "but she did not take any action." Ms. Dillard opined that DCS had exercised reasonable efforts to find a suitable family member to take Joseph.

Jackie M., the current foster parent, testified about Joseph's time in his home and the progress made during those three months.

Sherry J. testified again at the second hearing. She introduced pictures of her current home and described the conditions there. She admitted that, prior to the removal of Joseph from her home, she had been ill for four or five weeks. Sherry J. stated that she would have visited Joseph more if DCS had allowed her to do so. She admitted that she had not filed a petition for custody for 17 months after her recovery, "until after they told me he might be adopted. I thought he was alright where he was."

Roberto M., Joseph's maternal grandfather, who was currently residing with Sherry J., also testified in support of Sherry J.'s petition for custody.

STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Consequently, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). The termination of a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn.

Code Ann. § 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Tennessee's termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). A trial court is only required to find one statutory ground in order to terminate parental rights. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

1.

In challenging the trial court's decision to terminate her parental rights, Mother asserts that DCS failed to fulfill its statutory obligation to make reasonable efforts to find a less drastic alternative to the child remaining in DCS custody. She specifically argues that DCS should have placed Joseph with Sherry J., the child's maternal grandmother, thereby obviating the need for termination of parental rights.

DCS acknowledges that Mother suggested Sherry J. as a relative placement and that the department did not investigate Sherry J.'s new home or her fitness to take care of Joseph. DCS did not consider Sherry J. a suitable placement in light of the deplorable conditions found in her home at the time of Joseph's initial removal and her failure to take steps to protect Joseph when she became ill. It is DCS's position that its statutory duty to investigate appropriate relative placements is not a continuing duty, but a duty applicable during the first thirty days after a child's removal from the home.

Tennessee Code Annotated § 37-2-403 contains the relevant statutory provisions:

(a) (1) (A) Within thirty (30) days of the date of foster care placement, an agency shall prepare a plan for each child in its foster care. Such plan shall include a goal for each child of:

(i) Return of the child to parent;

(ii) Permanent placement of the child with a fit and willing relative or relatives of the child;

(iii) Adoption, giving appropriate consideration to § 36-1-115(g) when applicable;

(iv) Permanent guardianship; or

(iv) A planned permanent living arrangement.
. . .

(d) Whenever a child is removed from such child's home and placed in the department's custody, the department shall seek to place the child with a fit and willing relative *if such placement provides for the safety and is in the best*

-8-

*interest of the child.* Notwithstanding any provision of this section or any other law to the contrary, whenever return of a child to such child's parent is determined not to be in the best interest of the child, then such relative with whom the child has been placed shall be given priority for permanent placement or adoption of the child prior to pursuing adoptive placement of such child with a non-relative.

(Emphasis added). These provisions establish a preference for family placement over adoption by non-relatives, but only where consistent with the safety and best interest of the child. *See State Dept. of Human Serv. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990); *In re O.J.B.*, No. W2009-00782-COA-R3-PT, 2009 WL 3570901, at *9 (Tenn. Ct. App. Nov. 2, 2009); *In re S.B.*, M1999-00140-COA-R3-CV, 2000 WL 575934, at *4 (Tenn. Ct. App. May 12, 2000). This court has previously interpreted the quoted provisions of Tenn. Code Ann. § 37-2-403 as addressing "placement immediately after removal from the home and a preference for adoption by relatives with whom such initial placement has been made." *In re S.B.*, 2000 WL 575934, at *4; *see also In re Adoption of A.K.S.R.*, 71 S.W.3d 715, 718 (Tenn. Ct. App. 2001).

In this case, Joseph was initially placed with Cedric and Yvonne C., blood relatives of his siblings. Thus, DCS did choose a relative placement for Joseph when he first came into custody. After about six months, however, Yvonne C. informed DCS that she could no longer care for Joseph. Joseph was then placed with Clechette W., a foster parent. By the time of the second hearing, however, Joseph had been placed with another foster parent, Mr. Jackie M.. Mother asserts that DCS should have considered Sherry J. as a possible relative placement each time there was a disruption in foster placements. As stated above, the statutory preference for relative placement applies only during the period immediately following removal from the home. Once that period has ended, DCS is no longer required to give preference to a relative placement.

Furthermore, under the circumstances of this case, we cannot agree with Mother that DCS should have investigated Sherry J. as a possible relative placement once she had recovered from her illness. Sherry J. testified that it took about six months for her to return to good health; thus, she was not available as a placement option during the period immediately following Joseph's removal from the home. Moreover, Sherry J. was responsible for Joseph's care at the time of his removal for environmental neglect. Although she emphasizes that her failure to ensure Joseph's safety at that time resulted from a serious illness, DCS offered proof that Sherry J. had been contacted prior to the removal about improving the conditions in her home and that she took no action. At the very least, Sherry J. could have found someone else to care for the child; as a last resort, she could have contacted DCS to provide temporary care for him. Furthermore, Sherry J. waited 17 months

after her recovery before she filed a petition for custody. She testified that she thought Joseph was "alright where he was" and petitioned for custody only when she heard the child might be adopted.

Finally, this court has repeatedly held that the failure to place a child with a relative is not a basis to defeat termination. *In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010); *In re Deashon A.C.*, No. E2009-01633-COA-R3-PT, 2010 WL 1241555, at *8 (Tenn. Ct. App. Mar. 31, 2010); *In re K.L.D.R.*, No. M2008-00897-COA-R3-PT, 2009 WL 1138130, at *8 (Tenn. Ct. App. Apr. 27, 2009). Such custody concerns should be raised in the dependency and neglect proceedings.[4]

2.

Mother argues that the trial court erred in finding that grounds exist to support the termination of her parental rights.

A party seeking the termination of parental rights must prove two elements by clear and convincing evidence: the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009); *In re Valentine*, 79 S.W.3d at 546; Tenn. Code Ann. § 36-1-113(c). A trial court is only required to find one statutory ground in order to terminate parental rights. *In re D.L.B.*, 118 S.W.3d at 367. In this case, the trial court ordered that Mother's parental rights be terminated on three statutory grounds: abandonment, substantial noncompliance with the permanency plans, and the persistence of conditions that prevent the return of the children.

Pursuant to Tenn. Code Ann. §§ 36-6-113(g)(1) and 36-1-102(1)(A)(iv), the trial court found that Mother had abandoned Joseph. The definition of "abandonment" in Tenn. Code Ann. § 36-1-102(1)(A)(iv) is satisfied if a parent is incarcerated at the time of the institution of an action to declare a child to be abandoned and the parent "has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child."[5] This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior,

---

[4]Mother includes in her brief an argument challenging the trial court's denial of Sherry J.'s petition for custody. Sherry J., however, did not appeal that decision. Mother lacks standing to appeal the trial court's decision regarding Sherry J.'s separate petition for custody. *See In re Noel B.F.*, No. M2010-02343-COA-R3-PT, 2011 WL 3610427, at *8 (Tenn. Ct. App. Aug. 16, 2011). Moreover, the reasons discussed above support the trial court's denial of Sherry J.'s petition.

[5]Although the court's order contains some language suggesting that Mother also abandoned Joseph by failing to pay support, we decline to consider that ground since there is no evidence that Mother's failure to pay support while in prison was willful.

substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). An incarcerated parent is "severely compromise[d]" in her ability to perform parental duties. *Id.* at 866. Thus, a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.*

In this case, there is no dispute that Mother was incarcerated from the time of Joseph's removal from the home until after DCS filed the petition for termination of parental rights. In addition to making findings about the appalling conditions found in Sherry J.'s home at the time of Joseph's removal, the trial court made the following pertinent factual findings regarding Mother:

> When [Mother] was interviewed by the department case manager, she could not give an adequate explanation as to why she had left her children with her mother, . . . whom she had known was not able to care for the children. . . .

> [Mother] has been incarcerated since December 15, 2008, having been convicted on June 24, 2009 for aggravated assault and sentenced to six years imprisonment. [Mother] had gotten into a fight with a lady and cut her with a knife.

The evidence does not preponderate against these findings, and Mother's brief does not include any arguments on the "wanton disregard" ground. Clear and convincing evidence supports the trial court's finding that Mother's conduct prior to incarceration constituted a wanton disregard for Joseph's welfare.

The trial court also found that Mother failed to substantially comply with the provisions of the permanency plan, pursuant to Tenn. Code Ann. § 36-1-113(g)(2), and that conditions still existed that prevented the return of the children to Mother, pursuant to Tenn. Code Ann. § 36-1-113(g)(3). In addressing these grounds, Mother argues that she complied with the permanency plan requirements as much as possible given her incarceration, that any noncompliance was not willful, and that the conditions that resulted in Joseph's removal had been cured since Sherry J. had recovered and could take care of him. With respect to the latter point, we have already discussed the issue of Sherry J.'s availability as a family placement.

Mother's position boils down to her assertion that her incarceration prevented her from fully complying with the permanency plan and remedying the problems that needed to be addressed. It appears that Mother did everything within her power while incarcerated to

accomplish the actions required of her by the permanency plans. The fact remains, however, that her continued incarceration prevented her from obtaining safe housing and a source of income to provide for Joseph. To prove grounds for termination pursuant to Tenn. Code Ann. § 36-1-113(g)(2), DCS was required to demonstrate that: "(1) the requirements of the permanency plan were reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, and (2) the parent's noncompliance was substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *State Dept. of Children's Serv. v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006). Mother does not challenge the requirements of the permanency plan or deny the fact that, due to her incarceration, she failed to comply with important requirements. She does not cite any authority, and we know of none, for the idea that a parent's substantial noncompliance with a permanency plan must be willful to justify termination of parental rights on that basis.[6]

The evidence clearly and convincingly establishes the existence of the three statutory grounds found by the trial court for termination of Mother's parental rights.

3.

DCS was also required to prove by clear and convincing evidence that termination "is in the best interest of the child." Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d at 546. Tennessee Code Annotated § 36-1-113(i) lists factors to be considered by the court in making its best interest determination:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

---

[6]We reject Mother's suggestion that, by offering Sherry J. as a suitable placement, Mother complied with the permanency plan requirement of providing a stable home. The permanency plan requirement at issue addressed Mother's ability to provide for the child herself in furtherance of the goal of reunification. And, as discussed above, DCS did not err in rejecting Sherry J. as a suitable placement.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Ascertaining whether termination is in a child's best interest is necessarily a fact-intensive inquiry. *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006). Moreover, the best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

The trial court made specific findings of fact to support its conclusion that termination of Mother's parental rights was in the child's best interest:

1. [Mother has] not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent[ ].
. . .

-13-

3.  A meaningful relationship has not otherwise been established between the child and [Mother] . . . .

4. [Mother has] not paid child support consistently with the child support guidelines promulgated by the Department pursuant to Tenn. Code Ann. § 36-5-101.

5. [Mother has] shown little or no interest in the welfare of the child.

6.  The child is placed in a foster home that wishes to adopt the child and the child has a strong bond with the foster parents.

The evidence does not preponderate against these findings.  Other than pointing to the availability of Sherry J. as a relative placement, an argument addressed fully above, Mother asserts that she is now out of jail, living in a stable home, and in a position to take care of Joseph.  There is no evidence in the record, however, to support these assertions.  This court must make its determinations based upon the evidence of record.  Tenn. R. App. P. 13.

Mother also argues generally, without any supporting evidence, that changing caretakers and homes is likely to have an adverse effect on a child's emotional and psychological health.  Although the fact that DCS had to move Joseph from one foster home, to a temporary placement, and then to the present foster home is cause for concern, the issue here is whether termination of Mother's parental rights was in Joseph's best interest.  At the time when the trial court made its decision, Joseph had been in the same foster home for about six months and, according to all of the evidence presented, had bonded with the foster family and was doing well.

Clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights was in Joseph's best interest.

CONCLUSION

We affirm the judgment of the trial court.  Costs of appeal are assessed against Mother, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE